UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

| | |
|---|---|
| LATANYA SELTZER, | NOT FOR PUBLICATION<br>**MEMORANDUM & ORDER** |
| Plaintiff, | |
| -against- | 07-CV-0235 (CBA) |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

----------------------------------------------------------------X

AMON, United States District Judge:

Plaintiff Latanya Seltzer brings this action *pro se* seeking review of an adverse decision by the Commissioner of Social Security denying her claim for benefits. The administrative record was filed on May 15, 2007. Defendant served plaintiff with his motion for judgment on the pleadings on August 13, 2007. Plaintiff responded by a two page handwritten letter—without citation to any legal authority—which was filed along with defendant's brief on September 18, 2007. For the reasons stated herein, this case is remanded to the Social Security Administration for further proceedings.

**I.      Background**

Plaintiff was born in 1958. (R. 50, 438.) She is approximately 5'1" and weighs approximately 150-160 lbs. (R. 438.) At the time of the administrative hearing she lived with her 17 year-old son and 22 year-old daughter in an apartment. (R. 438-39.) She completed high school, has 70 college credits, and vocational training as a nursing assistant. (R. 68, 439-40.) At her administrative hearing, she testified that she spends her typical day in her room "trying to rest" because she is very tired. (R. 450.) However, the record elsewhere establishes that she

1

takes care of her asthmatic daughter (R. 87), cooks to some extent (R. 88, 450), cleans and does laundry (R.89, 450-51), and shops for food. (R. 90, 450-51.) She frequently takes public transportation and does so alone—in fact she did so on her way to her administrative hearing. (R. 89, 439.) She also attends church twice a month (R. 451) and enjoys going to thrift stores once a month. (R.452-53.)

Plaintiff participated in a work study program from September 2002 to 2004, while taking college courses. (R. 77, 440-41, 442-43.) Her primary responsibilities included answering telephones and reshelving videotapes. (R. 78, 440, 442, 461-62.) Prior to that, from September 1998 to June 2001, plaintiff had worked as a messenger delivering messages and mails to various college campus buildings. (R. 64.) While doing that job she walked 3 hours per day, stood one hour per day, sat one hour per day, and carried small envelopes weighing less than 10 pounds. (R. 64-65.) Prior to these two jobs plaintiff braided hair from her home. (R. 441.)

### A.  Medical Evidence of Physical Ailments

Plaintiff has had pulmonary valve stenosis since she was 12 years old. (R. 288-311, 345.) On April 21, 1994, she went to the Montefiore Medical Center emergency room complaining of musculoskeletal pain. (R. 349-56.) An electrocardiogram (EKG) was within normal limits. (R. 353-54.)

On May 31, 1995, plaintiff went to Montefiore again, this time complaining of chest and left arm pain. (R. 310-14.) An EKG was normal. (R. 312, 313-14.) However, she was referred to the cardiac clinic. (R. 250, 311.) Upon examination at that clinic on June 5, the cardiologist heard a grade II/VI systolic heart murmur and mid-systolic click at the apex. (R. 248.) The

cardiologist diagnosed atypical chest pain, pulmonary stenosis by history, and questionable mitral valve prolapse. (R.248-49.) He ordered an echocardiogram. (249.)

On June 15, 1995, Plaintiff went to the emergency room complaining of chest discomfort when lifting heavy objects and a rash with burning on urination. (R. 308-09.) She was referred to the dermatology clinic and told to return if the symptoms worsened. (R. 309.)

On June 24, 1995, the echocardigram that had been ordered on May 31 was performed. (R. 272.) It revealed normal chamber sizes, normal left ventricle ejection fraction, and mild to moderate pulmonic valve stenosis. (R. 272.) At a follow-up visit three days later, the cardiologist merely recommended that plaintiff take bacterial endocarditis prophylaxis before surgical and dental procedures and that she return in one year. (R. 247.)

Plaintiff went to the emergency room for chest pains on September 25, 1995. (R. 304-05.) An EKG was normal. (R. 306-07.)

On November 13, 1995, a Dr. Bijou authored a consultation request and report. Dr. Bijou noted plaintiff's history of mild to moderate pulmonary stenosis without symptoms of congestive heart failure or palpitations, but also noted that she carried out her activities of daily living without difficulty. (R. 264.) Plaintiff's heart had regular S1 and S2 sounds, and there was a grade 1/6 systolic murmur. (R. 264.) Dr. Bijou observed asymptomatic pulmonic stenosis, and plaintiff was medically cleared for a laser procedure for condylomata provided that she took Amoxicillin before it. (R. 262, 264.)

Thereafter, plaintiff did not return to the Montefiore clinic until September 29, 1997, though she did go to the emergency room twice with complaints of chest pain. (R. 256, 300-03, 292-95.) The first time, on November 21, 1995, an EKG was normal. (R. 302-03.) The second

time, on May 15, 1996, plaintiff left without being seen by a physician. (R. 293.) Upon return to the cardiac clinic in 1997, the cardiologist diagnosed mild to moderate pulmonary stenosis and ordered an EKG. (R. 257.)

However, on November 26, 1997, plaintiff again went to the emergency room complaining of chest pain. (R. 287-91.) Again, an EKG was normal. (R. 290.) The physician did not think that the chest pain was related to plaintiff's pulmonary stenosis (he did not think it was even cardiac in nature), and he recommended an echocardiogram. (R. 289.) Plaintiff did not return to the Montefiore clinic until October 19, 1998. (R. 257.)

On January 28, 1999, plaintiff underwent a stress exercise echocardiogram and EKG. (R. 278-81.) Pre-exercise, the echocardiogram showed normal left ventricle size and systolic function. (R. 278.) The pulmonic valve was not well visualized but the Doppler velocities were mildly increased, suggesting mild valvular pulmonic stenosis or mild peripheral pulmonary stenosis. (R. 278.) Both the EKG and the echocardiogram were negative for exercise-induced ischemia. (R. 280-81.)

On March 5, 1999, plaintiff again went to the emergency room, this time with complaints of lower abdominal pain, cramps and chest pressure. (R. 282-86.) After being examined, plaintiff left against medical advice. (284.)

In August of 1999, the cardiologist at the clinic cleared plaintiff for a surgical procedure, and recommended Ampicillin prophylaxis.[1] (R. 259, 261.) Plaintiff then did not keep a November 1999 appointment at the cardiac clinic. (R. 260.)

Years later, on February 26, 2004, plaintiff sought treatment for "female problems" at the

---

[1]The surgical procedure was a partial vulvectomy due to condylomata. (R. 209-10.)

4

Brooklyn Hospital Center ambulatory clinic. (R. 226; 225-30.) There had been a history of perianal warts since age 18, and she complained of chronic pain in the area. (R. 228.) She was diagnosed with symptomatic vulvar condylomata, given Emly cream, and told not to use lotions, soap, or perfumes. In addition, she was referred to the breast clinic for a mammogram to evaluate a lump in her right breast. (R. 230.) She was also referred to the cardiac clinic. (R. 230.) She kept neither follow-up appointment. (R. 231-33.)

### B. Medical Evidence of Non-Physical Ailments

In June of 2001, plaintiff's son was murdered at a store across the street from her home. (R. 64.) In January 2002 she was seen for initial intake at Sound View Throgs-Neck Community Mental Health Center regarding post-traumatic stress disorder stemming from the murder. (R. 143.) She had been suffering from sleep disturbance, weight loss, and frequent crying. (R. 143.) Subsequently, on March 18, 2002, plaintiff was examined by Dr. Lewis Fox at Sound View. (R. 126-31.) She reported depression dating back to her son's murder. (R. 126.) After examination, Dr. Fox diagnosed major depressive disorder, single episode, and prescribed Paxil and Ambien and further recommended supportive therapy. (R. 131.)

Plaintiff was subsequently seen for those therapy sessions by a social worker, Nicole Campanelli, and by Dr. Fox for medication reviews. (R. 133-42, 123-25.) On June 12, 2002, Dr. Fox and Ms. Campanelli prepared a report stating that plaintiff had been seen monthly for individual therapy and medication. (R. 212.) The diagnosis in the report was post-traumatic stress disorder. (R.212.) Ms. Campanelli noted that plaintiff did not feel mentally equipped to work at this time because she has difficulty with others, cries often and has difficulty concentrating. (R. 212.)

As of January 2003, Dr. Fox was prescribing Zoloft, Wellbutrin, Ambien and Ensure. (R. 124.) Soon thereafter, on February 7, 2003, plaintiff told Dr. Fox that she had been feeling her son's loss more strongly since his killer's trial had begun. (R. 134.) She reported feeling sad, angry, confused, and bereft, and that she had to drag herself to work. (R. 134.) However, she was alert, related well, and spoke normally. (R. 134.) Dr. Fox told her to increase her Zoloft dosage if she continued to feel increased anxiety during the trial. (R. 134.)

On March 3, 2003, another social worker, Paula Gilbert, from Bronx Community College, completed a questionnaire. (R. 147-53.) Ms. Gilbert had treated plaintiff sporadically dating back to May 19, 1999. (R. 147, 149.) Her treating diagnosis was post-traumatic stress disorder and major depression. (R. 147.) She observed that plaintiff was having great difficulty adjusting to the death of her son. (R. 147-48.) She noted that plaintiff had difficulties attending college classes, focusing on her studies, and completing assignments during the 2002-03 academic year. (R. 147.) Plaintiff further reported that she had difficulty getting up in the morning and completing tasks, and was troubled by flashbacks. (R. 147.) She also had difficulty sleeping and suffered from a lack of energy. (R. 148.) Ms. Gilbert concluded that plaintiff's understanding, memory, sustained concentration, persistence, and pace were limited. (R. 151.) She further concluded that plaintiff had no limitation in social interaction. (R. 151.)

On March 11, 2003, plaintiff again saw Dr. Fox, and he observed that her mood was improving and that she had gotten through the trial. (R. 134.) However, she subsequently saw the crime scene photographs, and was having nightmares about them—though she denied psychiatric symptoms. (R. 132.) She saw Dr. Fox again on May 6, and reported that her sleeping and appetite were improving despite having let her medication lapse. (R. 132.) Dr.

6

Fox's opinion was that she was still somewhat depressed and that she should continue her medication. (R. 132.)

On March 26, 2003, a doctor from Lovina Medical Pavilion (whose signature is entirely illegible and who is not otherwise identified), where plaintiff had been treated since March of 1994, completed a questionnaire. (R. 155-59.) Plaintiff had been to Lovina most recently a few days earlier for bronchitis. (R. 155.) The form indicates that plaintiff had no limitations on her ability to sit, walk, or stand—but then it indicates that she could walk/stand only for up to 2 hours and sit only for less than 6 hours. (R. 158.) Additionally, the form does indicate that plaintiff's ability to push and pull was limited, but this limitation is not further specified in the appropriate place on the form. (R. 158.)

On April 11, 2003, plaintiff was evaluated in conjunction with her social security claim, by a Dr. Edward Vadeika. (R. 167-68.) Plaintiff told Dr. Vadeika that she had been depressed for the past year-and-a-half, and had difficulty sleeping, concentrating, and with her memory during that time. (R. 167.) She told Dr. Vadeika that she had suffered from auditory hallucinations and had experienced paranoid ideation (the belief that people were watching her and talking about her). (R. 167.) Her medications at that time were still Wellbutrin, Zoloft, and Ambien. (R. 167.)

Plaintiff appeared groomed, alert, attentive, calm, cooperative, and responsive, and her speech was coherent. (R. 167.) However, while her thinking was free from loosening or scattering associations, it was flawed by paranoid trend with referential ideation. (R. 167-68.) Moreover, her mood was depressed, and she wept. (R. 168.) She was oriented to the date but not to her location, and her general fund of knowledge was poor, though her intelligence was

7

average. (R. 167-68.) Her concentration and memory were somewhat impaired, but her insight was fair and her judgment was good. (R. 168.) Dr. Vadeka concluded that plaintiff had a fair ability to comprehend instructions but less ability for responding appropriately to supervision, co-workers and work pressures in a work setting. (R. 168.)

Subsequently, on April 18, 2003, Dr. S. Bonete, a state agency review physician, reviewed the records from Sound View (from Dr. Fox and Ms. Campanelli), Ms. Gilbert's report, and Dr. Vadeika's report. (R. 170.) He noted that although plaintiff had reported hallucinations and paranoid ideation to Dr. Vadeika, she had never reported those symptoms to her treating physicians. (R. 170.) Moreover, he noted that the medications listed in Dr. Vadeika's report were anti-depressants, not anti-psychotic medications. (R. 170.)

Subsequently, on May 26, 2003, Dr. Bonete assessed that plaintiff was not significantly limited in the following areas: remembering locations and work-like procedures; understanding, remembering, and carrying out very short and simple instructions; making simple work-related decisions; interacting appropriately with the general public; asking simple questions or requesting assistance; accepting instructions and responding appropriately to criticism by supervisors; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; being aware of normal hazards and taking appropriate precautions; and traveling in unfamiliar places or using public transportation. (R. 175-76.) Dr. Bonete found plaintiff to be moderately limited in the following areas: understanding, remembering and carrying out detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance and being punctual; sustaining an ordinary routine without special supervision; working in coordination with or

8

proximity to others without being distracted by them or distracting them; completing a normal workday or workweek without psychological symptoms; responding appropriately to changes in the work setting; and setting realistic goals or making plans independently of others. (R. 175-76.) Dr. Bonete observed that the records indicated that plaintiff was depressed but not suicidal or psychotic, and that she had responded to treatment. (R. 177.) He ultimately concluded that she was capable of simple, routine work in a low stress setting. (R. 177.)

On November 10, 2003, Dr. Fox completed a psychiatric report. (R. 160-61.) He listed plaintiff's symptoms as severe depressive symptoms, decreased energy, anxiousness, change in appetite, and sleep disturbance. (R. 160.) A mental status examination revealed that plaintiff was alert and oriented and had good grooming and hygiene. (R. 160.) Her mood was depressed, and her affect was appropriate. (R. 160.) Plaintiff denied any suicidal or homicidal ideations, and, contrary to what was reported to Dr. Vadeka, denied having visual or auditory hallucinations. (R. 160.) Dr. Fox did not observe any thought disorder or psychomotor abnormalities. (R. 160.) He diagnosed major depression, single episode, and observed that severe depression persisted despite verbal therapy and psychotropic medication. (R. 161.) He also indicated that plaintiff was still taking Zoloft, Wellbutrin, and Ambien. (R. 161.)

Also within Dr. Fox's report, in the accompanying assessment form, he indicated that plaintiff had an unlimited/very good ability to understand, remember and carry out simple job instructions. (R. 163.) He concluded that she had a good ability to follow work rules, use judgment, function independently, understand, remember, and carry out detailed but not complex job instructions, maintain personal appearance, and demonstrate reliability. (R. 162-63.) Finally, he observed a fair ability to relate to co-workers, deal with the public, interact with

9

supervisors, deal with work stresses, maintain attention and concentration, understand, remember and carry out complex job instructions, behave in an emotionally stable manner, and relate predicably in social situations. (R. 162-63.) Dr. Fox did not rate any of plaintiff's work-related abilities as "poor/none." (R. 162-63.) However, he did opine that plaintiff's ability to effectively maintain employment may be impaired by her depression. (R. 164.)

On August 24, 2004, Shira Klahr, a social worker at F.E.G.S. Queens Behavioral Center, wrote a letter to whom it may concern reporting that plaintiff is her client. (R. 206, 217.) In a subsequent letter, dated December 16, 2004, Ms. Klahr further indicated that plaintiff had been a regular client at F.E.G.S. dating back to August 16, 2004. (R. 205, 218.) The August 24 letter reports that plaintiff had been suffering from major depressive disorders since the murder of her son three years earlier. (R. 206, 217.) Plaintiff apparently saw Ms. Klahr weekly for psychotherapy and took medication. (R. 206, 217.) Ms. Klahr further opined that the depression made it difficult for plaintiff to function and is often overwhelming. (R. 206, 217.)

In addition to Ms. Klahr, plaintiff also saw a Dr. Sablon Dartigue at F.E.G.S., who completed a form indicating that plaintiff was seen on March 3, 2005, for a fifteen minute visit. (R. 215.) At this visit, plaintiff complained of a lack of concentration, crying spells, and flashbacks. (R. 215.) However, she did not have suicidal thoughts, delusions, or hallucinations. (R. 215.) She reported that she slept well with medication. (R. 215.) Dr. Dartigue then concluded that plaintiff was stable although not satisfactory, and told her to continue taking Lexapro, Wellbutrin, and Ambien. (R. 215.) This one page is all that is found in the record documenting plaintiff's treatment sessions at F.E.G.S.

    **C.**     **The Administrative History**

Plaintiff applied for benefits on January 16, 2003. (R. 50-52.) Her application for benefits was denied based on a finding that she could do her past job as a messenger. (R. 31-35.) She requested a hearing, which was held before ALJ Hazel Strauss on February 3, 2005. (R. 36, 432-65.) Plaintiff was not represented by counsel. (R. 435-36.)

At the hearing, plaintiff testified that she could not work because she is depressed. (R. 443.) She stated that her symptoms include feelings that she does not fit in with anyone and feels left out. (R. 443.) She stated that her medications keep her calm but do not help her forget (presumably the murder of her son). (R. 446.) With respect to physical ailments, she testified that she suffers from a heart murmur, that she experiences shortness of breath and dizziness, and that she feels tired and weak everyday. (R. 447.) Despite her diagnosed heart conditions, she testified that she had not seen a cardiologist since 1999 because she was afraid to go. (R. 447-48.) In addition, she testified that she suffers from occasional bronchitis, but that she does not have asthma. (R. 448-49.) She further testified that she is unable to sit for any significant length of time due to painful papilloma in her vulvar area, for which she had surgery in 1999 and has since been treated with a spray. (R. 455-56.)

In addition to plaintiff, a vocational expert, Melissa Karlin, testified at the hearing. (R. 459-61.) The ALJ asked her to consider a hypothetical person with plaintiff's relevant characteristics (including the residual functional capacity he had determined plaintiff to have). (R. 460-61.) Ms. Karlin testified that this hypothetical individual could do certain sedentary jobs, specifically surveillance monitor (2,916 jobs locally and 55,000 nationally), bench hand (600 jobs locally and 90,000 nationally), and packing (171 local and 23,000 national). (R. 161.)

On August 18, 2005, ALJ Strauss issued a Notice of Decision denying plaintiff's claim.

11

She noted that plaintiff had "received treatment at Soundview Health Center where she was seeing a psychiatrist monthly and a social worker every two weeks until April 2004." (R. 24.) She further noted that plaintiff was currently being "treated at Queens Behavioral Center where she sees Dr. Darque monthly and Shira Klar [sic], a therapist, every two weeks." (R. 24.) ALJ Struass asserted that she had "assisted the claimant by issuing multiple subpoenas to claimant's various treating sources she identified." (R. 24.) However, the treating records of Dr. Darque and Ms. Klahr from F.E.G.S. are largely absent from the administrative record.

ALJ Strauss framed the issue to be determined as "whether the claimant is disabled under Section 1614(a)(3)(A) of the Social Security Act." (R. 23.) She then applied the evidence in the record to the five step test used to determine whether or not an adult is "disabled" within the meaning of the Act. (R. 24-29.) In so doing, she expressly considered the records from of Dr. Fox and Ms. Campanelli from Soundview, the March 2003 form authored by an unknown doctor, the various medical records relating to plaintiff's physical ailments, the report of Dr. Vadeika, the November 2003 report by Dr. Fox, The one treatment record from Dr. Dartique, and the report of Dr. Bonete. (R. 24-27.) She did not mention the opinion of Ms. Klahr.

ALJ Strauss concluded that plaintiff was not engaged in any substantial gainful employment, and that her impairments were severe. (R. 24.) She further concluded that her impairments did not meet or medically equal the listed impairments. (R. 26-27.) She then determined that plaintiff's residual functional capacity was:

> to perform simple, routine low stress type work, not belt assembly line type work and not work involving the general public face to face and work that is in a low stress setting. Allowing for the [plaintiff's] lack of energy and tiredness due to her mental impairments, I find that [she] can lift and carry 10 pounds frequently and can stand/walk at least 2 hours in a day and can sit without limitation. She can perform a range of sedentary work.

(R. 28.) After noting that plaintiff had no past relevant work,[2] ALJ Strauss proceeded to determine whether or not there were a significant number of jobs that the plaintiff could perform in our national economy in light of her residual functional capacity and age, education, and relevant experience. (R. 28.) She considered plaintiff's age, education, the medical-vocational guidelines, and Ms. Karlin's testimony in determining that there are a substantial number of jobs in our national economy that plaintiff can perform. (R. 28-29.) He therefore concluded that she is not disabled and denied her claim for benefits. (R.29-30.)

On January 27, 2006 the Appeals Council denied plaintiff's request for review. (R. 8-11.) Accordingly, ALJ Strauss' decision became the final decision of the Commissioner regarding plaintiff's application for benefits. After gaining two extensions of time to file a civil action (R. 5-7), plaintiff timely commenced this action *pro se* on January 16, 2007.

**II.     Discussion**

   **A.     Standard of Review**

"In reviewing the Commissioner's denial of benefits, the courts are to uphold the decision unless it is not supported by substantial evidence or is based on an error of law." Melville v. Apfel, 198 F.3d 45, 51-52 (2d Cir. 1999) (citing Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998) and Valente v. Sec'y of Health and Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

---

[2]The basis for this conclusion is not clear from the record since the plaintiff had previously worked as a messenger.

13

In making this determination, the reviewing court is to defer to the ALJ's resolutions of conflicting evidence. See Clark v. Comm'r of Social Security, 143 F.3d 115, 118 (2d Cir. 1998) ("In reviewing the denial of SSI benefits, we must determine whether the SSA's decision was supported by substantial evidence and based on the proper legal standard, keeping in mind that it is up to the agency, and not this court, to weigh the conflicting evidence in the record."). Additionally, the reviewing court is not to engage in an independent analysis of the claim for benefits at issue. See Melville, 198 F.3d at 52 ("It is not the function of the reviewing court to decide *de novo* whether a claimant was disabled ... or to answer in the first instance the inquiries posed by the five step analysis set out in the SSA regulations."). With these standards in mind, the Court will now address the instant claim for benefits.

      **B.**     **Standard for Benefits**

In order to qualify for benefits, a claimant first must meet the income and resource limitations of 42 U.S.C. §§ 1382a and 1382b. Then, the claimant must demonstrate an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). Furthermore, the impairment must be of such severity that the claimant "is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner engages in a five step analysis when confronted with an adult disability claim. First, the Commissioner considers whether or not the claimant is currently

14

engaged in substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(i). If not, the Commissioner next considers whether the claimant has a "severe" impairment. Id. at (a)(4)(ii). Third, if the impairment is severe, the Commissioner considers whether or not the claimant has an impairment which meets or medically equals those found in the listings. If so, the claimant is disabled and the inquiry ends. Id. at (a)(4)(iii). Next, if the impairment does not meet or equal the listings, the Commissioner considers whether or not the claimant has the residual functional capacity[3] to do her past relevant work.[4] Id. at (a)(4)(iv). Fifth and finally, if the claimant can not do any past relevant work, the Commissioner determines whether, based on residual functional capacity as well as age, education, and work experience, the claimant could do other work.[5] Id. at (a)(4)(v). In this case, ALJ Strauss correctly applied this five-step process. However, as the Court now explains, her failure to obtain and/or explicitly consider certain medical records necessitates remand in this case.

### C. The ALJ's Duty to Develop the Record

"It is the rule in [the Second Circuit] that 'the ALJ, unlike a judge in a trial, must ... affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding.'" Pratts v. Charter, 94 F.3d 34, 37 (2d Cir. 1996) (quoting Echevarria v. Sec'y of HHS, 685 F.2d 751, 755 (2d Cir. 1982)). "This duty arises from the Commissioner's regulatory

---

[3]Residual functional capacity is the most one can still do despite their limitations. 20 C.F.R. § 416.945(a)(1).

[4]The claimant bears the burden of proving that she cannot return to her former line of work. Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999).

[5]At the fifth step in the analysis, the burden falls on the commissioner to establish that there is gainful work in the national economy that the claimant could perform. See Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004) (citing Balsamo v. Chater, 142 F.3d 75, 80 (2d Cir. 1998) and Curry v. Apfel, 209 F.3d 117, 123 (2d Cir. 2000)).

obligations to develop a complete medical record before making a disability determination ... and exists even when ... the claimant is represented by counsel." Pratts, 94 F.3d at 37 (citing Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996)). "If the ALJ has not adequately developed the record, it is appropriate for the district court to remand the matter to the Social Security Administration for further development of the evidence." Providence v. Barnhart, No. 02 Civ. 9208, 2003 WL 22077445, at *7 (S.D.N.Y. Sept. 5, 2003) (internal quotations omitted); see also Polidoro v. Apfel, No. 98 CIV 2071, 1999 WL 203350, at *7 (S.D.N.Y. April 12, 1999) ("The ALJ's failure to mention [certain] evidence and set forth the reasons for his conclusions with sufficient specificity hinders the ability of a reviewing court to decide whether his determination is supported by substantial evidence.").

Moreover, in a case involving a *pro se* claimant, like this one, the ALJ's duty to develop the record is heightened. In such cases, "the ALJ has a 'duty ... to scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts.'" Hankerson v. Harris, 636 F.2d 893, 895 (2d Cir. 1980) (quoting Gold v. Sec'y of HEW, 463 F.2d 38, 43 (2d Cir. 1972)); see also Ortiz v. Chater, CV-94-1162, 1995 WL 625735, at *4 (E.D.N.Y. Oct. 12, 1995). The duty of the reviewing district court on appeal is heightened as well: "In such cases where the claimant was handicapped by lack of counsel at the administrative hearing, the reviewing court has a duty to make a searching investigation of the record to ensure that the claimant's rights have been adequately protected." Hankerson, 636 F.2d at 895 (internal quotations omitted); see also Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990).

Despite the ALJ's affirmative duty to develop the record she need not expressly consider every last piece of evidence. See Marnie v. Barnhart, No. 00 CV 9392, 2003 WL 22434094, at

16

*3 (S.D.N.Y. Oct. 24, 2003); see also Hill v. Chater, No. CV 96 3135, 1997 WL 10474444, at *7 (E.D.N.Y. July 7, 1997) ("The ALJ need not reconcile every conflicting piece of medical evidence.") (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)). However, she must at least implicitly reject—if not explicitly address, all evidence. See Ceballos v. Bowen, 649 F. Supp. 693, 702 (S.D.N.Y. 1986) ("The failure to acknowledge relevant evidence or to explain its implicit rejection is plain error." (citing Valente v. Sec'y of HHS, 733 F.2d 1037, 1045 (2d Cir. 1984))).

Nevertheless, to the extent that an ALJ fails in her duty to affirmatively develop the record and/or consider all of the relevant evidence, the court can still affirm her decision if this error is deemed to be harmless. See, e.g. Molina v. Barnhart, No. 04 Civ. 3201, 2005 WL 2035959, at *8 (S.D.N.Y. Aug. 17, 2005) (concluding that the ALJ erred by failing to make a reasonable effort to acquire the opinion of a doctor and further determining that this error was not harmless, such that remand was appropriate); Walzer v. Chater, 93 Civ. 6240, 1995 WL 791963, at *9 (S.D.N.Y. Sept. 26, 1995) (ALJ's failure to discuss a treating physician's report was harmless error where consideration of report would not have changed outcome).

In this case, ALJ Strauss states in her decision that she "assisted the claimant by issuing multiple subpoenas to claimant's various treating sources she identified." (R. 24.) However, while the ALJ did expressly note that plaintiff had been being treated for the prior year on a regular basis by Dr. Dartique and Ms. Klahr (monthly with respect to the former, weekly the latter), she apparently never obtained the records of those treatments with the exception of one

17

session with Dr. Dartique.[6]

The failure to gather the full records of Dr. Dartique's treatment of plaintiff is especially problematic in light of the fact that he was a treating physician whose opinion must be given special evidentiary weight. See Botta v. Barnhart, 475 F. Supp. 2d 174, 187 (E.D.N.Y. 2007) (citing Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) and Clark, 143 F.3d at 119. The treating physician rule "mandates that the medical opinion of a claimant's treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence." Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); see also 20 C.F.R. § 404.1527(d)(2); Rodriguez v. Barnhart, No. 04 Civ. 949, 2004 WL 2997876, at *7 (S.D.N.Y. Dec. 28, 2004). Moreover, if a treating physician is not given controlling weight, "the Commissioner must give 'good reasons in his notice of determination or decision for the weight he gives [the claimant's] treating source's opinion.'" Botta, 475 F. Supp. 2d at 187 (quoting Clark, 143 F.3d at 118) (alteration in original).[7] Failure to give good reasons is often a grounds for remand. Botta, 475 F. Supp. 2d at 187 (citing Schaal v. Apfel, 134 F.3d 496, 503-04 (2d Cir. 1998)); see also Rodriguez, 2004 WL 2997876 at *9 ("The failure to follow the procedure set forth in the regulations constitutes legal error and is grounds for a remand."). Because ALJ

---

[6]There is absolutely nothing in the administrative records regarding plaintiff's visits to see Ms. Klahr.

[7]In fact, the courts have developed a multi-factor test used to determine how much weight to give a treating physician's opinion: "In his determination of the level of deference to give the treating physician, the ALJ must consider the following factors: (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." Botta, 475 F. Supp. 2d at 187 (citing 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2) and Clark, 143 F.3d at 118; see also Schisler v. Sullivan, 3. F.3d 563, 567 (2d Cir. 1993).

18

Strauss failed to gather the majority of Dr. Dartique's treatment records, the Court cannot determine what his opinion regarding plaintiff's capacity to work is and whether or not ALJ Strauss correctly afforded his opinion the weight that it deserves under the treating physician rule.

In short, ALJ Strauss has inadequately developed the record in this case, because she did not gather the overwhelming majority of plaintiff's treatment records from F.E.G.S., and because she was obligated to do so and to consider them in accord with the treating physician rule. Moreover, the Court cannot infer that ALJ Strauss considered and implicitly rejected evidence that she had not obtained, nor can the failure to consider this evidence be determined by the Court to be harmless error in its absence. Accordingly, this matter should be remanded for further proceedings.

## III. Conclusion

For the foregoing reasons, this case is remanded to the Social Security Administration. On remand, the ALJ is directed to obtain complete records from F.E.G.S. regarding the treatment of plaintiff by Ms. Klahr and Dr. Dartique and to expressly consider that evidence against all of the evidence already in the record.

SO ORDERED.

Dated: Brooklyn, NY
December 18, 2007

Carol Bagley Amon
United States District Judge